```
              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                             CRIMINAL ACTION NO. 2:07-00066

**RUSTY LEE CRAIG**


### MEMORANDUM OPINION AND ORDER

The defendant, Rusty Lee Craig, is before the court on a two-count indictment alleging offenses occurring on February 15, 2007, at Cross Lanes, West Virginia. Count One charges that the defendant was a fugitive from justice in possession of seven listed firearms. Count Two charges that one of those firearms possessed by the defendant had its manufacturing serial number obliterated. Count One charges the defendant's status as a fugitive from justice as stemming from his having fled from the state of Ohio to avoid prosecution for possession of and trafficking in controlled substances.

The Ohio drug charge arose from activity on March 1, 2006, when Patrolman Burt L. Skeen of the Bellville Police Department in Bellville, Ohio, stopped and arrested the defendant in Bellville which is in Richland County, Ohio. The

defendant gave his address as being 171 Circle Drive, Cross Lanes, West Virginia.  In April 2006 the defendant was released on bond on that charge.  According to the briefs of both the government and the defendant, the defendant was subsequently arrested while on a camping trip in Nicholas County, West Virginia for the misdemeanor offenses of public intoxication and discharging a firearm too close to a campground.  As a consequence of that arrest, the defendant's bond was revoked and, on June 30, 2006, a bench warrant was issued by the Court of Common Pleas of Richland County, Ohio, for his arrest by order of Judge James D. Henson, acting for Judge James Deweese.  That bench warrant directed that the defendant be pursued in any county in the state of Ohio.  By order entered by the same judge the same day, the bench warrant was ordered immediately "updated" from a statewide warrant to a nationwide warrant.

　　　　According to the briefs of both parties, the defendant was on August 6, 2006, found passed out in a public place in Cross Lanes, West Virginia, and was arrested and held in a West Virginia jail awaiting extradition to Ohio.  When Ohio made no apparent effort to extradite the defendant, he was released from custody in West Virginia about three months later.  When Patrolman Skeen later learned, sometime in the latter part of

2006, that the defendant was no longer being held in West Virginia pending extradition, he reached the defendant's father by telephone and asked about the defendant's whereabouts only to be informed by the father that the defendant was not there.

It was not until February 15, 2007, while the defendant's vehicle, having apparently been impounded nearly a year earlier at the time of his arrest on March 1, 2006, was being processed that Patrolman Skeen realized that the June 2006 warrant was still outstanding.  By late afternoon of that day Patrolman Skeen contacted Deputy United States Marshal Bill Seckman, stationed in this district, and faxed to him fifteen pages of material for use in apprehending and arresting the defendant.  The faxed materials received by Seckman included the bench warrant and its update issued as set forth above on June 30, 2006.  Those materials also included an obscure picture of the defendant's head and shoulders which Seckman shared with the other officers who would be assisting him. Patrolman Skeen emphasized that the defendant had both drugs and weapons in his possession at the time of his March 2006 arrest and suggested that a potential location for finding the defendant in West Virginia would be at his father's home at 171 Circle Drive in Cross Lanes, as well as the Cross Lanes residence of Willy

Wilkinson with whom defendant had been arrested on March 1, 2006.  Upon receiving these materials Seckman promptly set about assembling a group of officers to assist in effecting the defendant's arrest.

At about 9:00 p.m. on February 15, 2007, Seckman, along with United States Deputy Marshals Honaker and Richter and Kanawha County Deputy Sheriff Pauley went to the residence of the defendant's father at 171 Circle Drive in Cross Lanes.  Upon their arrival, Seckman and Pauley went to the front door while Honaker and Richter were dispatched to the rear of the house to guard against a possible back door escape.  Honaker and Richter entered the rear yard through an open wooden gate.

The lot on which the house is located slopes downward from right to left as one faces it.  It also slopes downward from front to back.  The house consists of one story with a full basement, the left portion of which is utilized as a garage with a sharply sloped entry from the street on which the house fronts.  When Honaker went to the rear of the house he observed there were two exits, one being a door at ground level which led into the basement and the other being a door at the first floor level that opened on to a deck.  The deck was supported by

4

timber posts and occupied an area that was at the left end of the house as one faced it from the rear.

Underneath the deck was a large basement window opening.  It was partially shielded from view by vinyl lattice that covered all of the outer portion of the area underneath the deck except for a set of nine wooden steps that led from the ground to the deck.  A large triangular piece of the lattice, though attached to the steps that constituted the hypotenuse of the triangle, was not fully secured, presumably in order to allow ready access to the area under the deck.  The apex of that triangular piece was located at a point near where the steps reached the deck, nearly intersecting with the top of a timber post supporting the deck.  At that point the lattice appeared to have been hooked to the top of the timber post just under the deck level by something in the nature of chicken wire.  The vinyl was stiff enough to hang to the ground along the vertical line of the timber post without otherwise being attached to the post or to the ground that formed the base of the triangle.  The vinyl lattice could be pulled back at that point, not unlike a curtain, to gain access to the underside of the deck.

While Honaker was facing the rear of the house, he detected the only light from the basement level as coming from

the large glassed-in window under the deck and observed the silhouettes of two individuals in the room where the light was located.  When he pulled back the lattice and moved under the deck to the large window, on the inside of which was a closed venetian blind, he was able to see into the room through a twisted slat located near the top of the blind.  There he observed a female and a male fitting the description that he had been given of the defendant as to height and weight, as well as age, and concluded that the male, who was seen running by him, was the defendant.  Honaker immediately called out, "He is in the basement" and Richter repeated the message so that it could be heard by Seckman at the front door.

By the time the message was received, Seckman, who had intended to approach the residence on a knock and talk basis, had already knocked once on the front door and had heard no response.  Upon hearing Honaker's statement that he had seen the defendant in the basement, Seckman knocked a second time harder and called out, "Police - open the door."  When there was no response, Seckman called out a third time and announced that the door was coming down if it was not opened.  Also about this time Seckman heard a crash come from within the house.  Seckman then called out, "You've got 30 seconds - open this door now."  When there was again no response, Seckman kicked the door hard enough

6

to damage the doorjamb at which point the door was opened by the defendant's father in the presence of the defendant's mother. Seckman stated to them, "Where's Rusty?  We're here for your son."  The father answered that he was not there and had not been seen for several days.  Seckman replied, "Well, that's funny because my guys are telling me they just saw him downstairs."  Defendant's father answered, "Well, he is not here.  You can look, but he is not here."

Seckman and Pauley then entered the living room with Seckman proceeding directly to the adjoining kitchen and to the steps that led from the kitchen to the basement where he, having observed a pistol on the bed in the bedroom, immediately opened the basement door so that Honaker might enter.  The officers set about to sweep and secure the premises and their own safety while looking for the defendant.  In doing so, Honaker found a loaded shotgun behind a cabinet or dresser that was pulled out from the wall.  Honaker promptly unloaded the weapon.  The quick sweep revealed only those two weapons as well as the presence of the father, mother and the young female first seen by Honaker in the basement bedroom with the defendant.

Seckman suspected that the defendant had, while Seckman was seeking entry into the residence, hid himself in the attic.  The attic was accessible through either of two ceiling entries, one in a bedroom closet and the other at the end of the hallway.  Knowing of the presence of the firearms in the basement bedroom, as well as the defendant's history of being in possession of two weapons at the time of his arrest on the drug charges nearly a year earlier, Seckman concluded that it would be unwise to search the attic, particularly with its limited access.  Seckman called in a K-9 unit and then threatened the defendant with sending the dog into the attic at which point the defendant fell through the ceiling onto the floor, from which he sustained minor injuries.

The defendant was taken into custody, handcuffed and escorted to the front lawn along with the other three individuals in the house who were also handcuffed.  Seckman administered the usual Miranda warnings to the father, mother and the young female.  Honaker administered the customary Miranda warnings to the defendant who then told the officers that there could be found, in his basement bedroom, pistols, rifles and a shotgun, as well as drugs, and gave his consent to a search for those items.  In addition to the pistol and shotgun that had already been found during the initial sweep by the

officers, the further search yielded the rest of the firearms that are charged in Count One of the indictment along with such other items as a bullet proof vest, a hand held zapper and paraphernalia related to drugs.  No drugs, however, were found.  Later that evening, at the defendant's booking at the Kanawha County Sheriff's Department, the defendant admitted that the weapons found by the officers were his.  The defendant's father gave a written statement to that same effect.

      The court finds that the defendant's father, in the presence of the defendant's mother, gave consent to Seckman that the officers may enter to look for their son, doing so at a time when they knew their son had hidden himself in the attic crawlspace.  The sweep that followed revealed in plain view the pistol on the bed in the basement bedroom where the defendant had been seen by Honaker who, upon entry, saw the shotgun behind the pulled-out cabinet or dresser.  After the defendant was taken into custody, he was orally given Miranda warnings following which he freely acknowledged that other weapons were in the basement bedroom and gave consent to the further search that yielded the weapons listed in the indictment, as well as the other items already noted.  The defendant also acknowledged that those weapons belonged to him.

Apart from the consent to search voluntarily and unequivocally given to Seckman at the front door by the defendant's father in the presence of his mother, the officers engaged in the lawful process of an attempt to arrest the defendant as a fugitive from justice based on the outstanding warrant issued by the Court of Common Pleas of Richland County, Ohio, on June 30, 2006.  See United States v. Van Metre, 150 F.3d 339 (4th Cir. 1998); State of Arizona v. Reasoner, 154 Ariz. 377, 742 P.2d 1363 (1987).  When the officers went to the residence of the defendant's parents at 171 Circle Drive in Cross Lanes, West Virginia, they did so with some expectation that the defendant would be found at that address.  When Honaker pulled back the hanging vinyl lattice work and peered through the window glass and the twisted slat of the venetian blind and spied an individual fitting the defendant's description, the officers had a reasonable belief that the defendant was located in that residence and were authorized to enter it for the purpose of effecting the defendant's arrest with or without consent.

The court makes all of the foregoing as findings of fact, by a preponderance of the evidence.  The court further finds and concludes that, based on either or both (1) consent to

search the residence for the defendant and (2) reasonable belief of the officers that the fugitive defendant subject to the Ohio warrant was present in the residence, the officers were authorized to enter and arrest him and seize the weapons in plain view as well as those found while securing the premises, along with the other incriminating articles found there. Additionally, the voluntary statements and consent to search for still other weapons by the defendant himself were made to the officers following his arrest and after he was given the requisite Miranda warnings.

The defendant's motion to suppress is, accordingly, denied as to the arrest of the defendant, the items seized and the statements made by him as well as those statements made by his father.

The Clerk is directed to forward copies of this written opinion and order to the defendant and all counsel of record.

DATED: August 8, 2007

_____
John T. Copenhaver, Jr.
United States District Judge

11